Peter Eugene PELAYO, Jr., Plaintiff,

v.

CITY OF DOWNEY; City Of Downey Police Department; Chief Roy Campos; Sgt. Irizabal; Sgt. Romero; Ofc. Llamas # 10494 (And Estate of Jose Llamas); Ofc. Yepes # 10084; Cpt. Dryer; Cpt. Miller; Cpt. Esteves; Ofc.

Lockwood # 11103; Cpl. Shockey # 16567; Ofc. Rosario # 10085; Ofc. Rodriguez # 11244; Los Angeles County; Los Angeles County Sheriff's Department; Sheriff Lee Baca; Deputy Runyan; Deputy Burke # 253668; Deputy Emery # K95; Deputy Reynaga # 443556; Deputy Castellanos # 455190; Sgt. Corina # 213435; Deputy Ditsch # 235065; Deputy Cochran # 209388; Deputy Reynolds; Deputy Brandell; and Does 1 through 50, Inclusive, Defendants.

No. CV 07–02802 MMM (RZx).

United States District Court,
C.D. California.

July 31, 2008.

Peter Goldstein, Peter Goldstein Law Offices, Los Angeles, CA, for Plaintiff.

David D. Lawrence, Scott E. Caron, Lawrence Beach Allen & Choi, Glandale, CA, Eugene P. Ramirez, Randall B. Zor-

ick, Timothy J. Kral, Manning and Marder Kass Ellrod Ramirez LLP, Los Angeles, CA, for Defendants.

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

MARGARET M. MORROW, District Judge.

On April 27, 2007, plaintiff Peter Eugene Pelayo, Jr. commenced this action against numerous defendants. Certain defendants were associated with the City of Downey and its police department.[1] Others were associated with Los Angeles County and its Sheriff's Department.[2] The complaint alleged that officers used excessive force against Pelayo while arresting him on April 29, 2006. Pelayo filed a first amended complaint on November 28, 2007. The only cause of action asserted against the City of Downey and Officer Llamas (and the Estate of Jose Llamas) is a § 1983 claim for violation of Pelayo's constitutional rights. The City, the Downey Police Department, and Officer Llamas (and Estate of Jose Llamas) have now moved for summary judgment on this claim.

## I. FACTUAL & PROCEDURAL BACKGROUND

### A. Procedure

Pelayo's first amended complaint, filed November 28, 2007, asserts claims for violation of civil and constitutional rights under 42 U.S.C. § 1983, assault, intentional infliction of emotional distress, negligence, violation of the Unruh Act, violation of the

---

1. These include the City of Downey, the Downey Police Department, Captains Dryer, Miller, and Esteves, Sergeants Irizabal and Romero, Corporal Shockey, Officer Llamas (and Estate of Jose Llamas), and Officers Yepes, Lockwood, Garcia, Rosario, and Rodriguez.

2. These include the County of Los Angeles, the Los Angeles Sheriff's Department, Sheriff Lee Baca, Deputies Runyan, Burke, Emery, Reynaga, Castellanos, Ditsch, Cochran, Reynolds, Brandell, and Sergeant Corina.

Americans with Disabilities Act ("ADA"), and failure to intervene. It seeks general and special damages, punitive damages against the individual defendants, and attorney's fees and costs. The first amended complaint asserts claims for the first time against Downey Police Chief Roy Campos.[3] It also named several additional individual defendants associated with the Los Angeles County Sheriff's Department in the body, although they are not referenced in the caption.[4]

On December 27, 2007, the parties stipulated to dismissal of the ADA claim against defendants Baudino, Corbett, Erickson, Garay, Golden, Ingreso and Plent. In late January 2008, the parties stipulated to the dismissal of Los Angeles County and several individual defendants associated with the City of Downey and its police department, Yepes, Dryer, Miller, Esteves, Lockwood, Garcia, Shockey, Rosario, Rodriguez, Campos, Irizabal, and Romero.[5]

On June 6, 2008, the City of Downey, the Downey Police Department, Officer Llamas and the Estate of Jose Llamas filed a motion for summary judgment on the only claim asserted against them—Pelayo's § 1983 claim for violation of his civil and constitutional rights.

## B.  Facts

### 1.  Facts Relevant to Excessive Force Claim Under § 1983

On April 29, 2006, at approximately 4:30 a.m., while on patrol in a marked police vehicle, Corporal Richard Shockey of the Downey Police Department observed a silver Toyota Corolla enter a parking structure on Second Street in the City of Downey without its headlights on, in violation of California Vehicle Code § 24250.[6] Pelayo was later identified as the driver of the Corolla.[7] Corporal Shockey observed the driver's side door of the vehicle open as the vehicle entered the structure and continue up the first floor ramp. Based on the circumstances, Shockey believed that the driver was attempting to dispose of or destroy evidence of a crime.[8]

Shockey drove to the exit of the parking structure and waited for the Corolla. The Corolla exited shortly thereafter, still without its headlights on, and proceeded a short distance down the street before turning on its lights.[9] Shockey followed the vehicle briefly, then signaled that it should pull over by activating the police car's solid red and blue lights.[10] Although he understood that he was supposed to stop, Pelayo did not pull over as requested, but continued down the street at a slow speed.[11] As

---

**3.**  First Amended Complaint, ¶ 7.

**4.**  The newly added defendants are Sergeant Baudino, and Deputies Corbett, Erickson, Garay, Golden, Ingreso, and Plent. (First Amended Complaint, ¶ 27).

**5.**  The remaining defendants in the case are the City of Downey, the Downey Police Department, Officer Llamas (and Estate of Jose Llamas), and the individual defendants associated with Los Angeles County and its Sheriff's Department: Baca, Runyan, Burke, Emery, Reynaga, Castellanos, Corina, Ditsch, Cochran, Reynolds, Brandell, Baudino, Corbett, Erickson, Garay, Golden, Ingreso and Plent.

**6.**  Defendants' Separate Statement of Uncontroverted Facts and Conclusions of Law in

Support of Defendants' Motion for Summary Judgment ("Def.'s Facts"), ¶ 1; Plaintiff's Response to Defendants' Separate Statement of Uncontroverted Facts and Conclusions of Law in Support of Defendants' Motion for Summary Judgment ("Pl.'s Response"), ¶ 1.

**7.**  Def.'s Facts, ¶ 2; Pl.'s Response, ¶ 2.

**8.**  Def.'s Facts, ¶ 3; Pl.'s Response, ¶ 3.

**9.**  Def.'s Facts, ¶ 4; Pl.'s Response, ¶ 4.

**10.**  *Id.*

**11.**  Def.'s Facts, ¶¶ 5–6; Pl.'s Response, ¶¶ 5–6.

a result, Shockey activated his rotating lights and spotlight.[12]

Pelayo eventually stopped the vehicle on Third Street in Downey, in front of the First Baptist Church of Downey.[13] He exited the vehicle and ran in the direction of the church.[14] Although Shockey shouted to Pelayo to stop, Pelayo ran onto the church property and around the back of the main building of the complex; Shockey followed but lost sight of him.[15] Shockey heard a door open and close. Since he had already radioed dispatch to advise that he was in pursuit of Pelayo, he waited for assistance for proceeding.[16]

Pelayo was employed by the First Baptist Church as a youth pastor, and had keys to the facility.[17] After evading Corporal Shockey, Pelayo entered the church through the foyer, closing the door behind him.[18] He then called his girlfriend, Ashley Rubin, who owned the Toyota Corolla, and asked her to report the car stolen, which she did.[19] Pelayo made his way up to the second floor classrooms of the church complex and hid in one of them.[20]

After Shockey lost sight of Pelayo, additional Downey police officers arrived and set up a perimeter around the church complex.[21] The officers assisting Shockey included Officers Jose Llamas, Alex Rodriguez, and Jonathan Yepes, as well as Ser-

geants Ralph Romero and Alex Irizibal.[22] The officers knew that Pelayo had evaded a lawful traffic stop and that Shockey had been forced to pursue him on foot.[23] They also knew that Pelayo had engaged in suspicious activity, which included driving without his headlights, entering a deserted parking structure at 4:30 a.m., and opening the door of his vehicle as he entered the garage.[24] Shockey told the officers that, based on the circumstances, he believed Pelayo had been attempting to dispose of evidence of a crime.[25]

As the Downey police were establishing a perimeter outside the church complex, two of the officers observed Pelayo near an open window in one of the second floor classrooms.[26] Officer Rodriguez shouted to Pelayo from the ground; he identified himself as a Downey police officer, and demanded that Pelayo surrender.[27] Pelayo did not respond; his evasion of the officers and refusal to surrender further reinforced the officers' suspicion that he had committed a crime.[28] Consequently, Officers Llamas, Rodriguez, and Yepes, together with Sergeants Romero and Irizabel, formed a search team and went to the second floor classrooms to locate Pelayo.[29] As they were forming the search team, the officers learned that the vehicle Pelayo had been driving had been reported sto-

---

12. Def.'s Facts, ¶ 7; Pl.'s Response, ¶ 7.

13. Def.'s Facts, ¶ 8; Pl.'s Response, ¶ 8.

14. Def.'s Facts, ¶ 9; Pl.'s Response, ¶ 9.

15. Def.'s Facts, ¶ 10; Pl.'s Response, ¶ 10.

16. Def.'s Facts, ¶ 11; Pl.'s Response, ¶ 11.

17. Def.'s Facts, ¶ 12; Pl.'s Response, ¶ 12.

18. Def.'s Facts, ¶ 13; Pl.'s Response, ¶ 13.

19. Def.'s Facts, ¶ 14; Pl.'s Response, ¶ 14.

20. Def.'s Facts, ¶ 15; Pl.'s Response, ¶ 15.

21. Def.'s Facts, ¶ 19; Pl.'s Response, ¶ 19.

22. Def.'s Facts, ¶ 20; Pl.'s Response, ¶ 20.

23. Def.'s Facts, ¶ 21; Pl.'s Response, ¶ 21.

24. Def.'s Facts, ¶ 22; Pl.'s Response, ¶ 22.

25. Def.'s Facts, ¶ 23; Pl.'s Response, ¶ 23.

26. Def.'s Facts, ¶ 24; Pl.'s Response, ¶ 24.

27. Def.'s Facts, ¶ 25; Pl.'s Response, ¶ 25.

28. Def.'s Facts, ¶¶ 25–26; Pl.'s Response, ¶¶ 25–26.

29. Def.'s Facts, ¶ 27; Pl.'s Response, ¶ 27.

len.[30] They also learned that Pelayo had keys to the church.[31] As the officers approached the second floor classrooms, they were cognizant of the fact that Pelayo knew that they had spotted him in one of the classrooms and been alerted to their presence by commands that he surrender.[32] The officers did not know whether Pelayo was still in a classroom or whether they would unexpectedly encounter him in a hallway. In this regard, Pelayo had the advantage of surprise.[33] The officers likewise did not know if Pelayo was armed.[34]

Although there was some light in the corridors, the building was not fully illuminated.[35] All five officers had their guns drawn as they proceeded along the corridors containing the classrooms.[36] The officers checked the doors to the classrooms, which were all locked. They requested that someone with keys to the church be summoned so that the doors to the classrooms could be opened.[37] While they were searching the second floor, Officer Llamas and Sergeant Irizibal heard noises coming from one of the classrooms.[38] Llamas was in the lead position as the officers made their way toward the noise.[39] Officer Yepes saw the door to Room 209 open and close, leading him to believe that Pelayo was in that classroom.[40] As a result, the officers took up positions near Room 209, with Llamas closet to the door. All of the officers had their duty weapons drawn, given the fact that Pelayo's behavior was erratic and that the officers considered him a felony suspect.[41]

Shortly thereafter, Pelayo opened the door and exited the room.[42] The parties dispute to some extent what happened next. Officer Llamas, who was at the front of the line of officers and closest to Pelayo as he exited, ordered Pelayo to stop and put his hands up.[43] Llamas saw that Pelayo was holding a metal object in his hand. Although Pelayo held only keys, Llamas believed the object was a gun.[44]

30. Def.'s Facts, ¶ 28; Pl.'s Response, ¶ 28.

31. Def.'s Facts, ¶ 29; Pl.'s Response, ¶ 29.

32. Def.'s Facts, ¶ 30; Pl.'s Response, ¶ 30.

33. Def.'s Facts, ¶ 31; Pl.'s Response, ¶ 31.

34. *Id.*

35. The parties dispute the amount of light in the building and whether the officers were required to use flashlights. (See Pl.'s Response, ¶ 31). Defendants contend there was ambient light coming from the classrooms, but that the corridors themselves were not lit and were still dark. (Def.'s Facts, ¶ 32). They assert that Llamas and Yepes were required to use flashlights because of the dark. (*Id.*, ¶¶ 32, 41). Pelayo, by contrast, asserts that the school lights were on and that hallway lights illuminated the area; he contends that none of the officers ever shined a flashlight at him. (Declaration of Peter Pelayo ("Pelayo Decl."), ¶¶ 11–12). Sergeant Romero, who was a member of the search team, supports this somewhat. He testified that it was light enough for him to see people and objects with sufficient clarity that he did not need to use a flashlight. (Declaration of Peter

Goldstein in Support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment ("Goldstein Decl."), Exh. 11 (Deposition of Ralph J. Romero) ("Romero Depo.") at 23:7–13).

36. Def.'s Facts, ¶ 33; Pl.'s Response, ¶ 33.

37. Def.'s Facts, ¶ 34; Pl.'s Response, ¶ 34.

38. Def.'s Facts, ¶ 35; Pl.'s Response, ¶ 35.

39. Def.'s Facts, ¶ 36; Pl.'s Response, ¶ 36.

40. Def.'s Facts, ¶ 37; Pl.'s Response, ¶ 37.

41. Def.'s Facts, ¶ 38; Pl.'s Response, ¶ 38.

42. Def.'s Facts, ¶ 39; Pl.'s Response, ¶ 39.

43. Def.'s Facts, ¶ 40; Pl.'s Response, ¶ 40.

44. Def.'s Facts, ¶ 42; Plaintiff's Separate Statement of Uncontroverted Facts and Conclusions of Law in Support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment ("Pl.'s Facts"), ¶ 2; Pelayo Decl., ¶ 13. Pelayo notes that Corporal Shockey

Llamas observed Pelayo raise the hand that was holding the metallic object.[45] Believing it to be a gun, Llamas fired in Pelayo's direction.[46] As Llamas fired, Pelayo ran away, toward stairs leading into the courtyard of the church.[47] Llamas fired again as Pelayo approached the stairs, because he believed that Pelayo had raised his hand again.[48] Pelayo maintains that he never stopped or aimed an object at the officers in the church complex.[49] He went down the stairs and across the church courtyard, where Llamas and the other officers lost sight of him.[50] Pelayo contends that Llamas continued to shoot at him as he ran down the stairs.[51] Sergeant Romero reported that he heard approximately six shots during the incident.[52] A field investigation report later showed that Llamas fired ten shots.[53] Llamas struck Pelayo in the left thigh and right thumb.[54] The incident, from the time Pelayo exited the classroom to the time Llamas lost sight of him, took place in a matter of seconds.[55]

After Pelayo managed to evade the officers, they set up a perimeter around the church complex to prevent him from escaping.[56] They contacted the Special Enforcement Bureau of the Los Angeles County Sheriff's Department, as they believed that Pelayo was armed and evading police, and that special forces would be required to extract him safely.[57]

Although wounded and bleeding, Pelayo continued to run and hide from the police.[58] He eventually made his way to the sanctuary of the church, where he set the building's alarm so that he would know if

---

never saw anything in Pelayo's hands, and never told anyone Pelayo was armed. (Pl.'s Facts, ¶¶ 19–20). Additionally, Sergeant Romero testified that during the incident, he never heard Llamas say that Pelayo had a gun. (*Id.*, ¶ 14). Pelayo maintains that police officers are trained to warn their fellow officers when they see a suspect with a gun. (*Id.*, ¶ 15).

45. Def.'s Facts, ¶ 44. Llamas told Sergeant Romero that Pelayo raised his arm and aimed a gun at him. (Pl.'s Facts, ¶ 12). Pelayo disputes this account, as he asserts that he never stopped and aimed any object at any police officer during the pursuit. (Pelayo Decl., ¶ 15).

46. Def.'s Facts, ¶ 45. Llamas later told Sergeant Romero that the metal object looked like a 45–caliber gun, which is a large gun. (Pl.'s Facts, ¶ 11). Although, as noted, Pelayo disputes that he had a handgun, and contends he held only a set of keys (Pl.'s Response, ¶ 45; Pelayo Decl., ¶ 13), he does not appear to dispute that Llamas believed he had a gun or that Llamas fired at him.

47. Def.'s Facts, ¶ 47; Pl.'s Response, ¶ 47.

48. Def.'s Facts, ¶ 48.

49. Pl.'s Response, ¶ 48; Pelayo Decl., ¶ 15.

50. Def.'s Facts, ¶ 49.

51. Pl.'s Response, ¶ 49; Pelayo Decl., ¶ 14.

52. Pl.'s Facts, ¶ 10. Defendants argue that some of Pelayo's facts are irrelevant in assessing whether Llamas' conduct was reasonable. (Defendants' Response to Plaintiff's Separate Statement of Uncontroverted Facts ("Def.'s Response") at 12). Evidence regarding the number of shots fired, however, is relevant at a minimum to provide context and background.

53. Pl.'s Facts, ¶ 7.

54. Def.'s Facts, ¶ 53; Pl.'s Response, ¶ 53.

55. Def.'s Facts, ¶ 50. Pelayo contends that fifteen to twenty minutes time the officers began chasing him and the time he was shot. (Pelayo Decl. appear to dispute, however, that his contact with Officer Llamas was brief, each other only in the corridor of the church complex.)

56. Def.'s Facts, ¶ 51; Pl.'s Response, ¶ 51.

57. Def.'s Facts, ¶ 52; Pl.'s Response, ¶ 52.

58. Def.'s Facts, ¶ 53; Pl.'s Response, ¶ 53.

the police entered the building.[59] Inside the sanctuary, Pelayo hid underneath a platform that served to extend the altar area over a set of stairs.[60] He removed the battery from his cell phone so that the phone would not ring as police were searching for him.[61] Pelayo remained in this hiding spot for approximately seven hours, falling asleep at one point.[62] When Sheriff's Department personnel found him several hours later, they ordered Pelayo to come out from his hiding place with his hands up.[63] Although Pelayo asserts that he did not resist, the Sheriff's Department used a police dog to detain him.[64] Pelayo was taken into custody and arrested between 1:30 and 2:00 p.m. on April 29, 2006.[65]

Downey police were not present in the church sanctuary when Pelayo was arrested.[66] Officer Llamas had left the scene shortly after the shooting occurred,[67] and was at the Downey police station when Pelayo was taken into custody.[68] He had no contact with Pelayo either before or after the shooting occurred.[69]

After his arrest, Pelayo asserted that he had run from the police because he was driving with a suspended license and believed he had two traffic warrants.[70] It was later discovered that earlier in the evening, Pelayo had committed a burglary, and was in possession of stolen property when the incident began.[71] In addition, Pelayo had stolen a golf cart charger from the parking structure the week before, which was still in the trunk of the car he was driving when he ran from Corporal Shockey.[72] Pelayo was later charged with, *inter alia*, violating California Penal Code § 148(a)(1) for resisting Corporal Shockey and Officer Llamas.[73] He pled guilty and was convicted of this misdemeanor charge.[74]

### 2. Facts Relevant to the *Monell* Claim

In addition to his § 1983 excessive force claim against Officer Llamas, Pelayo asserts a *Monell* claim against the City. Pelayo does not dispute that the Downey Police Department has adopted policies prohibiting the use of excessive force to effect an arrest or for any other purpose.[75]

59. Def.'s Facts, ¶¶ 54–55; Pl.'s Response, ¶¶ 54–55.

60. Def.'s Facts, ¶ 54; Pl.'s Response, ¶ 54.

61. Def.'s Facts, ¶ 56; Pl.'s Response, ¶ 56.

62. Def.'s Facts, ¶ 54; Pl.'s Response, ¶ 54.

63. Def.'s Facts, ¶ 57; Pl.'s Response, ¶ 57.

64. Pelayo Decl., ¶ 10; Def.'s Facts, ¶ 58.

65. Def.'s Facts, ¶ 59; Pl.'s Response, ¶ 59.

66. Def.'s Facts, ¶ 60; Pl.'s Response, ¶ 60.

67. Def.'s Facts, ¶ 62; Pl.'s Response, ¶ 62.

68. Def.'s Facts, ¶ 61; Pl.'s Response, ¶ 61.

69. Def.'s Facts, ¶ 63; Pl.'s Response, ¶ 63.

70. Def.'s Facts, ¶ 16; Pl.'s Response, ¶ 16.

71. Def.'s Facts, ¶ 17; Pl.'s Response, ¶ 17.

72. Def.'s Facts, ¶ 18; Pl.'s Response, ¶ 18.

73. Def.'s Facts, ¶¶ 66–67; Pl.'s Response, ¶¶ 66–67.

74. Def.'s Facts, ¶ 68; Pl.'s Response, ¶ 68. California Penal Code § 148(a)(1) provides: "Every person who willfully resists, delays, or obstructs any public officer, peace officer, or an emergency medical technician, as defined in Division 2.5 (commencing with Section 1797) of the Health and Safety Code, in the discharge or attempt to discharge any duty of his or her office or employment, when no other punishment is prescribed, shall be punished by a fine not exceeding one thousand dollars ($1,000), or by imprisonment in a county jail not to exceed one year, or by both that fine and imprisonment." CAL PENAL CODE § 148(a)(1).

75. Def.'s Facts, ¶ 69; Pl.'s Response, ¶ 69.

Defendants assert that there were no policies, practices, or customs of the Department at the time of the incident that caused the constitutional deprivations alleged by Pelayo.[76] Pelayo disputes this, citing the fact that Llamas was apparently not interviewed about the shooting until the next day.[77] He maintains that had policies against excessive force existed, Llamas would have been interviewed and "reprimanded for his reckless conduct" on the day of the incident, and that he would not have been allowed to return the following day for an interview.[78]

## II. DISCUSSION

### A. Legal Standard Governing Motions for Summary Judgment

A motion for summary judgment must be granted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R.CIV.PROC. 56(c). A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. On an issue as to which the nonmoving party will have the burden of proof, however, the movant can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case. See *id.* If the moving party meets its initial burden, the nonmoving party must set forth, by affidavit or as otherwise provided in Rule 56, "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); FED.R.CIV.PROC. 56(e)(2).

Evidence presented by the parties at the summary judgment stage must be admissible. FED.R.CIV.PROC. 56(e)(1). In reviewing the record, the court does not make credibility determinations or weigh conflicting evidence. Rather, it draws all inferences in the light most favorable to the nonmoving party. See *T.W. Electrical Service, Inc. v. Pacific Electrical Contractors Ass'n*, 809 F.2d 626, 630–31 (9th Cir. 1987). Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. See *Falls Riverway Realty, Inc. v. Niagara Falls*, 754 F.2d 49, 56 (2d Cir.1985); *Thornhill Pub. Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir.1979).

### B. Whether Pelayo May Assert His Claim Against the Estate of Officer Llamas

Officer Llamas died on October 11, 2006.[79] Pelayo therefore seeks to recover

---

76. Def.'s Facts, ¶ 71.

77. Pl.'s Response, ¶ 71. As support for this assertion, Pelayo proffers the transcript of a recorded interview with Jose Llamas, dated April 30, 2006. (Goldstein Decl., Exh. 9). Defendants object to the document on foundation and authentication grounds. (Defendants' Objections to Evidence Presented by Plaintiff in Support of Opposition to Defendants' Motion for Summary Judgment ("Def.'s Objections") at 7). The court need not rule on this objection, however, because even if it were to consider this evidence in Pelayo's favor, it is insufficient to state a *Monell* claim for reasons stated *infra*.

78. Pl.'s Response, ¶ 71.

79. Def.'s Facts, ¶ 73; Pl.'s Response, ¶ 73.

damages on his § 1983 claim from Llamas' estate.

### 1. Claims Against a Decedent's Estate

" 'The "estate" of a decedent is not an entity known to the law. It is neither a natural nor an artificial person. It is merely a name to indicate the sum total of the assets and liabilities of a decedent, or of an incompetent, or of a bankrupt.' " *Sevilla v. Estate of Wiley*, No. C051984, 2007 WL 1562831, *3 (Cal.Ct.App. May 31, 2007) (quoting *Tanner v. Best's Estate*, 40 Cal.App.2d 442, 445, 104 P.2d 1084 (1940)).[80] " 'An "estate" can neither sue nor be sued.' " *Id.* (quoting *Estate of Bright v. Western Air Lines*, 104 Cal. App.2d 827, 829, 232 P.2d 523 (1951)).

Under California law, there are two methods for recovering damages from a deceased tortfeasor. If the decedent's property has been distributed through a probate administration in the probate court, the plaintiff must first filed a claim in probate court. See CAL. PROB.CODE § 9351 ("An action may not be commenced against a decedent's personal representative on a cause of action against the decedent unless a claim is first filed as provided in this part and the claim is rejected in whole or in part"); see also *Boyle v. County of Kern*, CV 03–5162 OWW GSA, 2008 WL 220413, *7 (E.D.Cal. Jan. 25, 2008) ("Before a creditor may commence a lawsuit against an estate, the creditor must file a claim.... Filing a lawsuit against an estate is not the equivalent of filing a probate claim," citing *Van Ort v. Estate of Stanewich*, 92 F.3d 831, 841 (9th Cir. 1996)). Where the decedent's property is distributed without probate, however, the recipients of the decedent's property are personally liable for his debts. See CAL. PROB.CODE § 13109 ("A person to whom payment, delivery, or transfer of the decedent's property is made under this chapter is personally liable, to the extent provided in Section 13112, for the unsecured debts of the decedent. Any such debt may be enforced against the person in the same manner as it could have been enforced against the decedent if the decedent had not died. In any action based upon the debt, the person may assert any defenses, cross-complaints, or setoffs that would have been available to the decedent if the decedent had not died").

There is an exception to these rules, however. Under Probate Code § 550, "an action to establish the decedent's liability for which the decedent was protected by insurance may be commenced or continued against the decedent's estate without the need to join as a party the decedent's personal representative or successor in interest." CAL. PROB.CODE § 550(a); see also *Van Ort*, 92 F.3d at 841 ("There is an exception to this sequence requirement. 'An action to establish the decedent's liability for which the decedent was protected by insurance may be commenced ... without first filing a claim as provided in this part,' " citing CAL. PROB.CODE § 9390(a)). "Such an action 'shall name as defendant, "Estate of (name of decedent), Deceased,"' " *Estate of Wiley*, 2007 WL 1562831 at *3 (quoting CAL. PROB.CODE § 552), and the "[s]ummons shall be served on a person designated in writing by the insurer or, if none, on the insurer." CAL. PROB.CODE § 552(a); see also *California Dep't of Toxic Substances Control v.*

---

**80.** "Although the court is not bound by unpublished decisions of intermediate state courts, unpublished opinions that are supported by reasoned analysis may be treated as persuasive authority." *Scottsdale Ins. Co. v. OU Interests, Inc.*, No. C 05–313 VRW, 2005 WL 2893865, *3 (N.D.Cal. Nov. 2, 2005) (citing *Employers Ins. of Wausau v. Granite State Ins. Co.*, 330 F.3d 1214, 1220 n. 8 (9th Cir. 2003) ("[W]e may consider unpublished state decisions, even though such opinions have no precedential value")).

*Interstate Non–Ferrous Corp.,* 298 F.Supp.2d 930, 949 (E.D.Cal.2003) ("Under section 552, the estate of decedent is named as defendant, however, only the insurer is served notice of the proceedings. The suit technically proceeds against the estate to determine liability, but any such liability is imposed only upon the insurance companies and only up to the amount of any applicable insurance. The proceedings shall be in the name of the estate, 'but otherwise shall be conducted in the same manner as if the action was against the personal representative,' " citing CAL. PROB. CODE § 552).

"Unless the personal representative of the estate is joined as a party to the action, damages are limited to the limits and coverage of insurance." *Id.* (citing CAL. PROB.CODE § 554); *Van Ort,* 92 F.3d at 841 ("[I]f an action seeks damages exceeding the insurance coverage, it may not proceed '[u]nless a claim is first made as provided in this part.' CAL. PROB.CODE § 9390(b). Moreover, California Probate Code § 554 states that, as a general rule, damages sought against an estate are limited to insurance coverage unless the estate's personal representative is joined as a party, and the plaintiff filed a claim according to section 9390. Because the Van Orts never made a claim, the Estate argues that their recovery should be limited to the insurance coverage"). "A judgment against the estate may be enforced against the insurer." *Estate of Wiley,* 2007 WL 1562831 at *3 (citing CAL. PROB. CODE § 9390(a)).

## 2. Whether Pelayo Has Asserted a Claim Against Llamas' Estate in Accordance With California Law

All of Llamas' property was distributed to his heirs by the end of October 2006, without probate administration.[81] Pelayo has not sued the executor or administrator of Llamas' estate, nor against any of the recipients of his property.[82] Instead, he argues that the exceptions set forth in Probate Code §§ 550 and 552 apply.[83] Pelayo maintains that as a police officer acting in his official capacity at the time of the incident, Officer Llamas is protected by insurance provided by the City of Downey.[84] He asserts that he seeks only to make a "claim under the decedent's insurance with the City of Downey for the damages incurred." [85] Pelayo contends that the City is self-insured, and that he properly named Llamas' estate as a defendant and served the complaint on the City as the insurer.[86]

Probate Code § 552 applies "only in actions to determine a decedent's liability where the decedent is protected by insurance." *Blue Ridge Ins. Co. v. Stanewich,* 142 F.3d 1145, 1150 (9th Cir.1998) (citing CAL. PROB.CODE § 550(a); 4 Witkin, CALIF. PROCEDURE, PLEADINGS § 240(3) (4th ed.1997)). The plaintiff in such an action bears the burden of proving that insurance coverage exists.[87] See *Escobedo v. Estate*

---

81. Def.'s Facts, ¶ 74; Pl.'s Response, ¶ 74.

82. See Defendants' Notice of Motion and Motion for Summary Judgment, or, Alternatively, for Summary Adjudication ("Def.'s Mot.") at 7.

83. Plaintiff's Memorandum of Points and Authorities in Opposition to Defendants' Motion for Summary Judgment ("Pl.'s Opp.") at 7.

84. *Id.*

85. *Id.* Pelayo states that he "had no intention of pursuing any claim against the decedent's estate personally." (*Id.*)

86. *Id.* at 8.

87. Pelayo's first amended complaint does not allege that he is limiting his claim for relief against Llamas to Llamas' insurance coverage. Compare, e.g., *Hernandez v. Estate of Hopkins,* B 182407, 2007 WL 1828272, *18 (Cal.Ct.App. June 26, 2007) ("Plaintiffs jointly made a Code of Civil Procedure section 998 offer to compromise, sent to 'Charles W. Hop-

*of Snider*, 14 Cal.4th 1214, 1228, 60 Cal. Rptr.2d 722, 930 P.2d 979 (1997) ("Plaintiff [in an action for wrongful death against decedent's estate pursuant to § 552] presented no evidence the policy issued by National to Snider was ever filed with, or certified to, the department. As the party with the burden of proving coverage, plaintiff also had the burden of showing any fact necessary to such a finding, including that the policy at issue fell within the class of policies subject to section 24361. Plaintiff failed to meet that burden. The superior court, therefore, correctly found for defendant on the issue of coverage"); see also *Aggio v. Estate of Aggio*, C 04–4357 PJH, 2008 WL 2491697, *5 (N.D.Cal. June 19, 2008) ("Because plaintiffs [seeking recovery under § 550] can recover only if there is coverage for the claimed relief under the Sequoia policy, plaintiffs can prove entitlement to indemnity only by demonstrating actual coverage under the policy for the relief they seek").

Pelayo has failed to produce any evidence that the City has a policy of insurance issued by a third-party carrier or that it is self-insured under California Government Code § 990.[88] Compare, e.g., *Hernandez*, 2007 WL 1828272 at *18 (evidence in the record indicated that the defendant estate's liability insurance had a policy limit of $1 million and "[p]laintiffs represented to the court repeatedly that it was going for the insurance, not against the personal representative of the estate"). Defendants, in fact, assert that Pelayo has conducted no discovery on the issue of insurance.[89] His claim therefore appears to rest solely—and inadequately—on the assumption that such a policy exists.

More significantly, assuming the City has insurance, Pelayo has not met his burden of establishing that Llamas is entitled to coverage and/or indemnification under its policy or self-insurance certificate. The City contends that any insurance it obtained was designed to protect the munici-

---

kins, M.D.' Dr. Hopkins did not accept the offer, and it expired after 30 days. Five months later and before trial, on December 30, 2003, Dr. Hopkins died. Plaintiffs elected to amend their complaint pursuant to Probate Code sections 550 and 554 because they decided not to 'bring[] in the personal representative.' The Estate's liability insurance had a policy limit of $1 million. Plaintiffs represented to the court repeatedly that [they were] going for the insurance, not against the personal representative of the estate. 'We are forced to name the estate under the Code, and *we'll go against the insurance*' "); *Neuland v. Russell*, 50 Cal.App.3d 1, 4, 123 Cal. Rptr. 230 (1975) ("In the interim, the Neulands, represented by new counsel, filed two motions: (1) for relief under Code of Civil Procedure section 473 from their failure to file the original complaint within the 3 months time period prescribed by Probate Code section 714, and (2) for permission to file a second amended complaint against the Russell Estate based upon Probate Code section 721. That section permits an action against a decedent's estate without filing a prior creditor's claim provided the recovery

sought is limited to the decedent's liability insurance coverage. The proposed pleading which accompanied the motion to permit the filing of a second amended complaint named 'The Estate of Russell' as an additional defendant and clearly and unequivocally reduced the amount of the recovery sought against the estate and its executrix to the amount of the insurance coverage ($50,000)").

**88.** California Government Code § 990 provides in part: "Except for a liability which may be insured against pursuant to Division 4 (commencing with Section 3200) of the Labor Code, a local public entity may: (a) Insure itself against all or any part of any tort or inverse condemnation liability. (b) Insure any employee of the local public entity against all or any part of his liability for injury resulting from an act or omission in the scope of his employment." CAL GOV'T CODE § 990(b).

**89.** Defendants' Reply to Plaintiff's Opposition to Motion for Summary Judgment, or, Alternatively, for Summary Adjudication ("Def.'s Reply") at 1.

pality against claims and judgments, not to protect Officer Llamas or other Downey police officers.[90] It asserts that a judgment against an individual officer would be paid by the policy only if the City was required to indemnify Llamas under California Government Code § 825.[91]

As this section indicates, indemnification of a public employee by a public entity is not automatic. The California Supreme Court has explained that, "[i]n 1963, the Tort Claims Act was enacted in order to provide a comprehensive codification of the law of governmental liability and immunity in California." *Farmers Ins. Group v. County of Santa Clara*, 11 Cal.4th 992, 1001, 47 Cal.Rptr.2d 478, 906 P.2d 440 (1995) (citing *Los Angeles Police Protective League v. City of Los Angeles*, 27 Cal.App.4th 168, 174, 32 Cal.Rptr.2d 574 (1994)). "As part of its overall statutory scheme, the Tort Claims Act provides that in the usual civil case brought against a public employee, a public entity is required to defend the action against its employee[, CAL. GOV'T CODE § 995 et seq.,] [92] and to pay any claim or judgment against the employee in favor of the third party plaintiff." *Id.* (citing CAL. GOV'T CODE § 825 et seq.). "A principal purpose of the indemnification statutes is to assure 'the zealous execution of official duties by public employees.'" *Id.* (quoting *Johnson v. State of California*, 69 Cal.2d 782, 792, 73 Cal.Rptr. 240, 447 P.2d 352 (1968)).

"The provisions relating to a public entity's duty to provide indemnification are addressed at sections 825 through 825.6" of the Government Code. *Id.* at 1002, 47 Cal.Rptr.2d 478, 906 P.2d 440. "Section 825(a) provides the procedure for a public

employee to request a defense against any claim or action arising out of an act or omission occurring within the scope of public employment, and provides for payment of a judgment or settlement after such a defense." *Laws v. County of San Diego*, 219 Cal.App.3d 189, 197 n. 9, 267 Cal.Rptr. 921 (1990). It states that "if an employee or former employee of a public entity requests the public entity to defend him or her against any claim or action against him or her for an injury arising out of an act or omission occurring within the scope of his or her employment as an employee of the public entity and the request is made in writing not less than 10 days before the day of trial, and the employee or former employee reasonably cooperates in good faith in the defense of the claim or action, the public entity shall pay any judgment based thereon or any compromise or settlement of the claim or action to which the public entity has agreed." CAL. GOV'T CODE § 825(a).

"If the public entity does not conduct the defense as requested, and the employee pays the claim or judgment against him, the employee may be entitled to recover such payment from the public entity 'only if he establishes that the act or omission upon which the claim or judgment is based occurred *within the scope of his employment as an employee of the public entity* and the public entity fails to establish that he acted or failed to act because of actual fraud, corruption or actual malice or that he willfully failed or refused to conduct the defense of the claim or action in good faith or to reasonably cooperate in good faith in the defense conducted by the public enti-

---

**90.** *Id.* at 2.

**91.** *Id.*

**92.** Section 995 states: "Except as otherwise provided in Sections 995.2 and 995.4, upon request of an employee or former employee, a

public entity shall provide for the defense of any civil action or proceeding brought against him, in his official or individual capacity or both, on account of an act or omission in the scope of his employment as an employee of the public entity." CAL. GOV'T CODE § 995.

ty.'" *Farmers Ins. Group*, 11 Cal.4th at 1002, 47 Cal.Rptr.2d 478, 906 P.2d 440 (citing CAL. GOV'T CODE § 825.2(b) (emphasis original)).

■ As can be seen, the statute is clear that the duty of a public entity to indemnify an employee is not triggered unless the employee makes an affirmative request for a defense in writing at least ten days before trial. See CAL. GOV'T CODE § 825(a); see also *Wathan v. Pazin*, CV 07–0874 AWI DLB, 2007 WL 4181716, *6 (E.D.Cal. Nov. 21, 2007) ("Whether or not County of Merced is added as a defendant, it is nonetheless required that the County of Merced indemnify and defend the individual Defendants *upon their request*," citing CAL. GOV'T CODE § 825 (emphasis added)); *State ex rel. Dockstader v. Hamby*, 162 Cal.App.4th 480, 484, 75 Cal.Rptr.3d 567 (2008) ("Because section 825 requires a government agency, *on timely request*, to defend and indemnify a public employee against claims arising out of an act or omission occurring within the scope of his or her employment, a suit against the defendants is tantamount to a suit against LAUSD itself" (emphasis added)); *Los Angeles Police Protective League*, 27 Cal. App.4th at 175 n. 7, 32 Cal.Rptr.2d 574 ("The duty to pay the judgment is related to the duty to defend. Government Code section 825, subdivision (a) provides that the public entity shall pay the judgment *when a timely request for a defense has been made* and the employee reasonably cooperated in good faith in the defense" (emphasis added)); *Younker v. County of San Diego*, 233 Cal.App.3d 1324, 1330, 285 Cal.Rptr. 319 (1991) ("In *Government Employees Ins. Co. v. Gibraltar Casualty Co.*, [184 Cal.App.3d 163 166–67, 229 Cal.Rptr. 57 (1986) ], the appellate court stated since

the teacher was acting within the scope of her employment at the time of the accident the district was obligated to defend and indemnify her. The appellate court noted *when a public employee requests defense and indemnification*, Government Code sections 825, 825.4, and 996.4 affirmatively require the entity to pay for defense of the lawsuit and to pay any judgment or settlement against the employee" (emphasis added)).[93]

■ It is also clear that in seeking indemnification, "the burden rests upon the public employee to establish that the act or omission was within the scope of employment." *Farmers Ins. Group*, 11 Cal.4th at 1002, 47 Cal.Rptr.2d 478, 906 P.2d 440 (citing *Los Angeles Police Protective League*, 27 Cal.App.4th at 176, 32 Cal. Rptr.2d 574; *Rivas v. City of Kerman*, 10 Cal.App.4th 1110, 1118–19, 13 Cal.Rptr.2d 147 (1992)); see also *Tenwolde v. County of San Diego*, 14 Cal.App.4th 1083, 1088, 17 Cal.Rptr.2d 789 (1993) ("In order for an employee to be indemnified by the government entity employer, the employee must follow certain procedural steps and establish that the claim or judgment arises in the context of the employee's scope of employment"). As defendants note, these requirements ensure that "(1) the plaintiff seeks recovery from the employee first, before indemnification is required; (2) the employee will have notice of the lawsuit; and (3) the City will not indemnify, and therefore subject itself to additional liability exposure, absent the express request of the individual defendant." [94] As defendants also note, § 825 "does not permit a plaintiff to sue the employer directly, as the presumed 'insurer' of the employee." [95]

---

**93.** Similarly, the public entity's duty to provide a defense for a civil action under § 995 arises only "upon request of an employee or former employee." CAL. GOV'T CODE § 995.

**94.** Def.'s Reply at 3.

**95.** *Id.*

■ Here, although under Probate Code § 550, Pelayo can sue Llamas' estate directly and serve the complaint on his insurer, he has failed to establish that the City is, in fact, Llamas' insurer.[96] Because there is no evidence that anyone has requested that the City defend and indemnify Llamas (or his estate) under Government Code § 825(a), Pelayo cannot show that Llamas is entitled to indemnification. Stated differently, Pelayo has failed to demonstrate that Llamas has any insurance protection covering an award of damages against him on the § 1983 claim.[97]

The California Supreme Court has held that establishing proof of insurance coverage is essential to recovery under Probate Code § 550. In *Escobedo v. Estate of Snider*, 14 Cal.4th 1214, 60 Cal.Rptr.2d 722, 930 P.2d 979 (1997), Snider, the pilot, and Escobedo, the passenger, were killed in the crash of a Piper aircraft. *Id.* at 1218, 60 Cal.Rptr.2d 722, 930 P.2d 979. Escobedo's mother filed a wrongful death action against Snider's estate, and served the complaint on Snider's former insurer, National Aviation Underwriters, Inc. under Probate Code § 552. *Id.* Approximately two weeks before the crash, National had notified Snider that his policy had been cancelled for nonpayment of premium. *Id.*

Escobedo argued that despite the purported cancellation, the policy had continued in force because the insurer failed to give prior notice to the California Department of Transportation as required by the California Uniform Aircraft Financial Responsibility Act ("CUAFRA"). *Id.* The Court explained that CUAFRA was not a mandatory insurance law, and that it did not require "that owners or operators of private aircraft maintain liability insurance or that owners and operators generally provide proof of such coverage to the department or any other agency." *Id.* "Instead, CUAFRA requires that *after* certain accidents a noncommercial aircraft owner or operator [must] demonstrate the ability to respond in damages through the deposit of security, proof of a liability policy in force at the time of the accident, or qualification as a self-insurer." *Id.* (citing CAL. PUB. UTIL.CODE §§ 24325–24353). CUAFRA includes a provision stating that aircraft liability policies cannot be cancelled unless the insured or insurer gives thirty days' prior notice to the California Department of Transportation. *Id.* (citing CAL. PUB. UTIL.CODE § 24361).

The trial court disagreed with Escobedo's argument that Snider's insurance policy continued in force due to the failure to comply with the notice requirements of § 24361, and entered judgment for Sni-

---

**96.** Pelayo does not appear to contend that Llamas had a personal insurance policy. (See Pl.'s Opp. at 7 ("The purpose of Plaintiff's action is to claim under the decedent's insurance with the City of Downey for the damages incurred"); *id.* at 9 ("Plaintiff is making a claim under the insurance for deceased Officer Llamas. He properly named the Estate and served the City as self-insurer of its police officers on duty"); Def.'s Reply at 1 ("It appears to be undisputed that Officer Llamas himself did not carry such a policy")).

**97.** The attorney retained by the City of Downey also represents Officer Llamas and his estate. At the hearing, plaintiff's counsel argued that this shows an heir of Llamas must have requested that the City defend the action on his behalf. Pelayo proffers no evidence that such a request was made, however, and it is just as likely that the City did not receive a formal written request under § 825(a), but elected voluntarily to represent Llamas in addition to the other defendants affiliated with it. Absent evidence on the point, the court cannot say that Pelayo has raised triable issues of fact as to whether the City is Llamas' or his estate's insurer, and cannot find that the City has a duty under § 825(a) to pay any judgment entered against the estate. This is particularly true since there is no indication that the City's indemnification obligations under § 825(a) would be triggered if it voluntarily assumed Llamas' defense.

der's estate. The Court of Appeal reversed. On appeal, the Supreme Court examined when the notice provision applied. It observed that the provision was "ambiguous as to whether it governs cancellation of *all* aircraft liability policies meeting certain coverage minima, or only those policies filed with the department after an accident to satisfy the financial responsibility requirement." *Id.* (emphasis original). After reviewing CUAFRA's text, legislative history, and purpose, and contrasting its language with a similar statute governing insurance requirements for highway carriers, the Court held that the notice provision "comes into play only when an insurance policy has been filed with, or certified to, the [Department of Transportation] as proof of ability to respond in damages." *Id.* at 1217–28, 60 Cal.Rptr.2d 722, 930 P.2d 979.

Having made this determination, the Court considered whether Escobedo had shown that it applied so as to continue Snider's policy in force. It stated:

"Plaintiff presented no evidence [that] the policy issued by National to Snider was ever filed with, or certified to, the department. As the party with the burden of proving coverage, plaintiff also had the burden of showing any fact necessary to such a finding, including that the policy at issue fell within the class of policies subject to section 24361. Plain-

tiff failed to meet that burden. The superior court, therefore, correctly found for defendant on the issue of coverage." *Id.* at 1228, 60 Cal.Rptr.2d 722, 930 P.2d 979.

The Court accordingly reversed the judgment of the Court of Appeal, and entered judgment for Snide's estate. *Id.*

Like Escobedo, Pelayo has not shown that Llamas has insurance coverage. Consequently, he cannot recover damages from the estate and/or Llamas' potential insurer, the City, under § 550. The court has found no authority suggesting that Pelayo can bypass the requirement that Llamas, or his heirs, request defense and indemnification from the City before it is required to indemnify and/or provide insurance coverage to him or his estate. Indeed, such a suggestion was expressly rejected by the Appeals Court of Massachusetts under factual circumstances similar to those at issue here. In *Grant v. Rosen*, 13 Mass.App.Ct. 1000, 433 N.E.2d 97 (1982), plaintiff attempted to compel the City of Springfield to indemnify the estate of one of a deceased police officer for a judgment recovered against the estate. *Id.* at 1000, 433 N.E.2d 97. Under Massachusetts law, "[a] grant of indemnification is predicated on the 'recommendation of the appointing (authority),'" *id.* (citing *Berube v. Selectmen of Edgartown*, 336 Mass. 634, 638, 147 N.E.2d 180 (1958)),[98] and

---

**98.** The *Grant* plaintiff argued that the City's obligation arose under Massachusetts General Laws ch. 41, § 100, as in force prior to its amendment in 1978. *Grant*, 13 Mass.App.Ct. at 1000, 433 N.E.2d 97. This law presently provides: "Upon application by a fire fighter or police officer of a city, town or fire or water district, or in the event of the physical or mental incapacity or death of such fire fighter or police officer, by someone in his behalf, the board or officer of such city, town or district authorized to appoint fire fighters or police officers, as the case may be, shall determine whether it is appropriate under all the circumstances for such city, town or district to indemnify such fire fighter or police

officer for his reasonable hospital, medical, surgical, chiropractic, nursing, pharmaceutical, prosthetic and related expenses and reasonable charges for chiropody (podiatry) incurred as the natural and proximate result of an accident occurring or of undergoing a hazard peculiar to his employment, while acting in the performance and within the scope of his duty without fault of his own. If such board or officer determines that indemnification is appropriate, such board or officer shall certify for payment, either directly or by way of reimbursement, by such city, town or district, in the same manner as a bill lawfully incurred by such board or officer but out of

"[t]he appointing authority has discretion to deny an application for indemnification," *id.* (citing *Fortin v. Mayor of Chicopee*, 325 Mass. 214, 215–16, 89 N.E.2d 760 (1950)). The court noted that "[a]n applicant aggrieved by such denial, or by failure of the appointing authority to take any action, may petition the Superior Court for relief as provided by the statute." *Id.* (citation omitted). Because it was "apparent ... that the plaintiff [had] not avail[ed] himself of this provision," the court affirmed the trial court's order denying plaintiff's attempt to compel indemnification. *Id.*

The relevant statutes and case law demonstrate that Pelayo cannot proceed against the Estate of Officer Llamas under Probate Code §§ 550 and 552 because he has not shown that he can recover damages on his excessive force claim from any insurance policy.[99] As defendants note, "[i]f Plaintiff wished to recover a judgment from the City's own insurance for the underlying incident, the proper procedure would have been to identify and serve either the representative of Officer Llamas' estate or a recipient of officer's Lla-mas' property."[100] "The estate could then have requested that the City indemnify it under Government Code § 825(a)."[101] To properly sue the estate, therefore, Pelayo should have named the recipients of Lla-mas' property despite the fact that he did not seek to recover from them personally. If Pelayo is permitted to bypass this step, he will be permitted, in effect, to recover directly from the City under § 1983 for actions taken by Llamas in his official capacity. This type of suit is barred by *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), which holds that a municipality cannot be held liable under § 1983 "*solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Id.* at 691, 98 S.Ct. 2018. Rather, § 1983 liability may be imposed only when a municipal "policy" or "custom" is the "moving force" behind a violation of federally protected rights. *Id.* at 694, 98 S.Ct. 2018. Consequently, the court grants defendants' motion for summary judgment on the § 1983 claim asserted against Officer Lla-mas and the Estate of Jose Llamas.

an appropriation for the purposes of clause (32) of section five of chapter forty, such of said expenses as may be specified in such certificate. Whenever such board or officer denies an application in whole or in part, such board or officer shall set forth in writing its or his reasons for such denial and cause a copy thereof to be delivered to the applicant.... Notwithstanding the provisions of section one hundred A or section one hundred D or any contrary provisions of any other general or special law, a city or town shall indemnify a police officer or fire fighter, to the extent and in the manner herein provided and subject to the same limitations, for expenses or damages incurred by him in the defence or settlement of a claim against him for acts done by him while operating a motor vehicle as such police officer or fire fighter." Mass. Gen. Laws ch. 41, § 100.

99. Pelayo contends that defendants seek to challenge service on the estate (Pl.'s Opp. at 8), and contends that the estate has waived the right to do so by making a general appearance in the action. (*Id.*). The fact that the estate has appeared does not obviate the need for Pelayo to prove that Llamas or his estate are entitled to insurance coverage. Cf. *Escobedo*, 14 Cal.4th at 1228, 60 Cal.Rptr.2d 722, 930 P.2d 979 (granting judgment in favor of a decedent's estate where plaintiff, proceeding under Probate Code §§ 550 and 552, failed to meet her burden of proving insurance coverage). Because Llamas apparently does not have personal insurance, and there is no evidence that the City has received a claim for indemnification on his behalf, Pelayo has not met this burden.

100. Def.'s Reply at 2.

101. *Id.*

### C. Whether Plaintiff's Claim Against Llamas is Barred by *Heck v. Humphrey*

Alternatively, the court finds that defendants' motion for summary judgment on Pelayo's § 1983 claim against Llamas and his estate must be granted because the claim is barred by *Heck v. Humphrey*, 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994). In *Heck*, the Supreme Court examined whether a state prisoner could challenge the constitutionality of his conviction in a § 1983 damages suit. Heck alleged that both police and prosecutors had engaged in unlawful investigatory practices, destroyed exculpatory evidence, and used illegal evidence at trial. *Id.* at 479, 114 S.Ct. 2364. He filed a § 1983 action seeking damages for the injuries he had sustained as a result of the allegedly unconstitutional actions.

The Court held that Heck's § 1983 action was not cognizable. It stated that "in order to recover damages for [an] allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254." *Id.* at 486–87, 114 S.Ct. 2364. The Court directed that "when a state prisoner seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already

been invalidated." *Id.* at 487, 114 S.Ct. 2364. By contrast, the Court stated, when "the plaintiff's action, even if successful, will not demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed, in the absence of some other bar to the suit." *Id.* at 487, 114 S.Ct. 2364 (footnote omitted).

#### 1. Legal Standard Governing Application of *Heck*

Defendants argue that *Heck* bars Pelayo's claim because he specifically pled guilty to a violation of California Penal Code § 148(a)(1) on the basis that he resisted Officer Llamas.[102] They assert that the charge was based on Pelayo's actions at the time of the shooting—i.e., at the time allegedly excessive force was used—since Pelayo did not encounter Llamas at any time before or after the shooting occurred.[103]

■ The elements of a violation of Penal Code § 148(a)(1) are that " '(1) the defendant willfully resisted, delayed, or obstructed a peace officer, (2) when the officer was engaged in the performance of his or her duties, and (3) the defendant knew or reasonably should have known that the other person was a peace officer engaged in the performance of his or her duties.' " *Smith v. City of Hemet*, 394 F.3d 689, 695 (9th Cir.2005) (en banc) (quoting *In re Muhammed C.*, 95 Cal.App.4th 1325, 1329, 116 Cal.Rptr.2d 21 (2002)). Pelayo contends that Llamas used excessive force when he fired at Pelayo on the night of his arrest. Defendants assert that a verdict in his favor on this claim would necessarily invalidate his conviction for violating Penal Code § 148(a)(1), since Pelayo could not have been convicted had Llamas been acting unlawfully at the time of the shooting.[104]

---

**102.** Def.'s Mem. at 8–9.

**103.** *Id.* at 9.

**104.** *Id.* at 10.

Pelayo invokes the Ninth Circuit's decision in *Smith v. City of Hemet,* and contends that he could not have pled guilty to resisting Llamas at the moment Llamas shot at him, since Llamas was using excessive force at that time.[105] In *Smith,* the court began its analysis by noting that an arrest is unlawful in California if, "at the time of the arrest," an officer is not lawfully performing his or her duties. *Smith,* 394 F.3d at 695–96. Thus, "[f]or a § 148(a)(1) conviction to be valid, a criminal defendant must have 'resist[ed], delay[ed], or obstruct[ed]' a police officer in the lawful exercise of his duties." *Id.* at 695; see also *Susag v. City of Lake Forest,* 94 Cal.App.4th 1401, 1409, 115 Cal.Rptr.2d 269 (2002) ("If the officer was not performing his or her duties at the time of the arrest, the arrest is unlawful and the arrestee cannot be convicted under Penal Code section 148, subdivision (a)"). An officer who uses excessive force in effecting an arrest is not acting lawfully. See *Smith,* 394 F.3d at 696 ("A conviction for resisting arrest under § 148(a)(1) may be lawfully obtained only if the officers do not use excessive force *in the course of* making that arrest" (emphasis original)); see also *People v. Olguin,* 119 Cal.App.3d 39, 45–46, 173 Cal.Rptr. 663 (1981) (an arrest made with excessive force is unlawful). The *Smith* court noted that " 'the time of the arrest' does not include previous stages of law enforcement activities that might or might not lead to an arrest, such as conducting an investigation; it includes

only the time during which the arrest is being *effected* " (emphasis original).[106]

In *Smith,* police officers responded to a call from Smith's wife, who alleged that Smith was hitting her. Upon arriving at the house to investigate, Officer Reinbolt encountered Smith on the front porch with his hands in his pockets. *Id.* at 693. Reinbolt instructed Smith to remove his hands from his pockets three times; Smith refused each time. *Id.* After Reinbolt called for backup, a number of other officers arrived together with a police canine. One of the other officers instructed Smith to turn around and place his hands on his head. Smith again refused to comply. *Id.* at 694. At this point, one of the officers sprayed Smith in the face with pepper spray. Smith responded by trying to flee into his house, but the door was locked. Several officers on the scene then moved onto the porch and threw Smith down. While he was on the porch, the dog was ordered to attack him, and did. *Id.* Smith then agreed to submit to arrest, but one of his hands was hidden from the officers' view, so the dog was ordered to bite him again. *Id.* This pattern of events continued, resulting in three dog bites and at least four separate sprays of pepper spray. *Id.* Like Pelayo, Smith pled guilty to a violation of California Penal Code § 148(a)(1). *Id.*

The *Smith* court began its analysis by identifying as "the relevant question ... whether success in a subsequent § 1983

---

**105.** Pl.'s Opp. at 13–14.

**106.** In *Yount v. City of Sacramento,* 43 Cal.4th 885, 76 Cal.Rptr.3d 787, 183 P.3d 471 (2008), the California Supreme Court clarified that "[a]lthough ... Penal Code section 148, subdivision (a)(1) is unlike the law of many states in that it is not limited to a defendant's conduct in resisting arrest but extends to a defendant's resistance of an officer in the discharge or attempted discharge of any duty of his or her office, it similarly requires that the officer

be lawfully engaged in the performance of his or her duties." *Id.* at 894, 76 Cal.Rptr.3d 787, 183 P.3d 471 (citations omitted). The Court observed that the Ninth Circuit in *Smith* "mistakenly limit[ed] § 148, subd. (a)(1) to resistance in the course of an arrest." *Id.* The Ninth Circuit's analysis of § 148(a)(1) in the context of an arrest is appropriate here, however, since Llamas was attempting to arrest Pelayo when they encountered each other in the corridor of the church complex.

suit would 'necessarily imply' or 'demonstrate' the invalidity of the earlier conviction or sentence under § 148(a)(1)." *Id.* at 695 (citing *Heck,* 512 U.S. at 487, 114 S.Ct. 2364). Defendants argued that if "Smith's allegations that he was subjected to excessive force during the arrest [were] ... found to be true, that finding [would] necessarily imply the invalidity of his criminal conviction under § 148(a)(1)." *Id.* at 696. Smith countered that the use of excessive force occurred "*after* he had committed the acts on which his conviction was based, and thus that a verdict in his favor would not imply that his conviction was invalid," or that "the record [did] not reflect which acts underlay his plea[, such that] his § 1983 action [was] not *necessarily* inconsistent with his conviction." *Id.* (emphasis original).

The en banc court agreed with Smith. It concluded that there was evidence that Smith's conviction had been based on "unlawful behavior that took place while he stood alone and untouched on his porch," i.e., during the course of the officers' investigation of his wife's allegations.[107] *Id.* at 697–98. The fact that the officers allegedly used excessive force "in the course of the arrest ... rendered the arrest unlawful," the court stated, but did not "render [the officers'] preceding investigation unlawful, nor ... invalidate a conviction for obstructing the investigation." *Id.* at 698. Because nothing in the record identified the factual basis for Smith's plea, the court observed, "[i]t [was] ... entirely possible that ... he pled guilty to a violation of § 148(a)(1) on the basis of his actions during the time the officers were conducting their lawful investigation." *Id.* As a result, the court concluded that "his lawsuit [did]

not necessarily imply the invalidity of his conviction and [was] ... not barred by *Heck.*" *Id.* at 699; see also *Sanford v. Motts,* 258 F.3d 1117, 1120 (9th Cir.2001) ("Sanford's conviction required that Motts be acting lawfully in the performance of his duties 'at the time the offense against him was committed.' Hence, if Motts used excessive force subsequent to the time Sanford interfered with his duty, success in her section 1983 claim will not invalidate her conviction. *Heck* is no bar").

■ Under *Smith,* it is clear that a subsequent § 1983 action calls into question the validity of an underlying conviction only if the "resistance" on which the criminal charge was based was contemporaneous with the alleged use of excessive force. In other words, "a conviction for resisting arrest under § 148(a)(1) may be lawfully obtained only if the officers do not use excessive force *in the course* of making that arrest. A conviction based on conduct that occurred *before* the officers commence the process of arresting the defendant is not 'necessarily' rendered invalid by the officers' subsequent use of excessive force in making the arrest.... Similarly, excessive force used after a defendant has been arrested may properly be the subject of a § 1983 action notwithstanding the defendant's conviction on a charge of resisting an arrest that was itself lawfully conducted." *Smith,* 394 F.3d at 696; see also *id.* at 699 n. 5. When an arrestee's plea could have been based on any of a number of different actions—only some of which would call the validity of the arrest into question—the court can find that a subsequent § 1983 action is barred only if the factual basis for the plea makes clear that

---

**107.** The court catalogued a series of acts of willful resistance by Smith that violated § 148(a)(1) and supported his conviction. These included twice refusing to take his hands out of his pockets, reentering his home, refusing to put his hands on his head, and refusing to turn around. See *id.* at 696–97 ("Each of these acts constituted a violation of § 148(a)(1) sufficient to warrant the filing of a criminal charge. Each could support a conviction under that section for obstructing the criminal investigation").

it was based on resistance during the course of the arrest. See *id.* at 699 ("Because we are unable to determine 'the factual basis for [Smith's] plea,' . . . his lawsuit does not necessarily imply the invalidity of his conviction and is therefore not barred by *Heck*," citing *Heck*, 512 U.S. at 487, 114 S.Ct. 2364).

The *Smith* court separated the officers' actions into "phases": the investigative phase, during which Smith refused to cooperate, and the arrest phase, during which the officers used physical force. See *id.* at 698 ("There were two different phases of the officers' conduct here"). During the investigative phase, it observed, the officers "issued only verbal commands, all of which were concededly well within the bounds of their general police powers." *Id.* It was undisputed that Smith disobeyed these verbal commands. The fact that the officers may have used excessive force during the subsequent arrest, the court concluded, did not "render their preceding investigation unlawful, nor . . . invalidate [Smith's] conviction for obstructing that investigation." *Id.*

While the court's reference to "phases" suggests a measure of formal separation between the officers' investigation and the arrest, the *Smith* court made it clear that the separation was a narrow one.[108] The Ninth Circuit directed courts to examine

the officers' actions rather than the plaintiff's. "[A]s long as the officers were acting lawfully *at the time* the violation of § 148(a)(1) took place, their alleged acts of excessive force, whether they occurred *before* or *after* Smith committed the acts to which he pled would not invalidate his conviction." *Id.* at 699 (emphasis original). As can be seen, the key question under *Smith* is whether the moment at which the criminal violation occurred is separate from the moment at which the constitutional violation occurred.

### 2. Applying *Heck* to Pelayo's Claims

■  When there are a number of distinct acts upon which a § 148(a)(1) plea may have been based, and force was used subsequent to one of them, the claim is not barred under *Smith*. See *id.* at 699 ("[A]s long as the officers were acting lawfully *at the time* the violation of § 148(a)(1) took place, their alleged acts of excessive force, whether they occurred *before* or *after* Smith committed the acts to which he pled would not invalidate his conviction"). Applying this standard, and viewing the facts in the light most favorable to Pelayo, the court concludes that his claim against Llamas is barred by *Heck*.

Pelayo asserts that the plea transcript does not spell out the factual basis for his plea, and that he pled guilty to resisting at

---

108. Cases in this circuit applying *Smith* have struggled to separate the investigative and arrest phases of incidents, and to define exactly how narrowly the *Heck* bar applies after *Smith*. In *Miller v. County of Butte*, Civ. No. S–00–1733 EJG/JFM, 2008 WL 540645, *5 (E.D.Cal. Feb. 25, 2008), for instance, plaintiff learned that her car was going to be towed. She was allowed inside the car to retrieve some of her belongings. She was then ordered to get out of the car and failed to do so in a timely manner. After she exited the vehicle, plaintiff was struck by a sheriff's deputy. She pled nolo contendere to a § 148(a)(1) charge on the basis that she failed to obey the order to get out of the car. See *id.*

at *3–5. As part of her plea agreement, two other battery charges against plaintiff were dismissed. *Id.* at *5. The court determined that "the only claim of excessive force which could be barred by plaintiff's plea is that which occurred when she was still in the car." *Id.* The force complained of, however, occurred *after* plaintiff exited the car. The court separated the arrest into two distinct stages—while plaintiff was inside the car and after she exited the vehicle. This was sufficient, in the court's view, to trigger the temporal distinction delineated by the *Smith* court, and to find that plaintiff's claim was not barred under *Smith*. See *id.*

a time when Llamas' conduct was lawful.[109] Pelayo specifically pled guilty to resisting Officer Llamas, rather than the other officers and sheriff's deputies he encountered during the incident on April 29, 2006.[110] Because it expressly references Officer Llamas, Pelayo's plea necessarily identifies the factual basis on which it rests. The court must therefore examine whether Pelayo has raised triable issues as to whether Llamas' efforts to arrest him can be separated into phases.

While the entire hours-long incident that culminated in Pelayo's arrest can be separated into phases, the same is not true of Pelayo's encounter with Officer Llamas in the corridor of the church complex. Officer Llamas was at the front of the line of officers in the corridor and closest to the classroom door from which Pelayo exited.[111] It is undisputed that when Pelayo exited the classroom, Llamas had his weapon drawn and ordered Pelayo to stop and put his hands up.[112] Llamas asserted that when Pelayo exited the classroom, he raised a hand holding a metal object.[113] Believing that the object was a gun, Llamas fired in Pelayo's direction.[114] Pelayo asserts that he did not stop as he exited the classroom, did not aim anything at the officers, and ran down the corridor away from the officers toward the stairs to the church courtyard.[115] There is no evidence that Llamas pursued Pelayo beyond the second floor corridor, and the parties do not dispute that Llamas left the scene shortly thereafter and had no further contact with Pelayo.[116] It is also undisputed that the encounter with Llamas, from the time Pelayo exited the classroom to the time Llamas lost sight of him, took place in a matter of seconds.[117]

Given the brevity of the encounter, and the fact that Pelayo's resistance—i.e., his flight down the corridor away from Llamas—occurred immediately upon his exiting the classroom (and thus immediately after Llamas ordered him to stop and put up his hands)—there simply is no evidence that Pelayo's encounter with Llamas occurred in separate phases. Rather, the record demonstrates that the encounter was a single, uninterrupted series of events that took place in a matter of seconds. Upon exiting the classroom, Pelayo immediately fled from Llamas. Llamas, whose gun was already drawn, ordered Pelayo to stop and then fired at him when he believed Pelayo pointed a gun at him.

Pelayo has identified no temporal break in his encounter with Llamas, nor has he demonstrated that Llamas was engaged in different types of activity while in the corridor, e.g., an investigation followed by an arrest. As defendants argue, Pelayo's "resistance of Officer Llamas indisputably took place during the few seconds between the time Plaintiff ran from the classroom until the time he ran down the stairs and disappeared from sight—the exact time that the shooting occurred." [118] Because

**109.** Pl.'s Opp. at 13–14.

**110.** As noted, Pelayo also pled guilty to resisting Corporal Shockey. (Def.'s Facts, ¶ 68; Pl.'s Response, ¶ 68).

**111.** Def.'s Facts, ¶ 40; Pl.'s Response, ¶ 40.

**112.** Def.'s Facts, ¶¶ 38, 40; Pl.'s Response, ¶¶ 38, 40.

**113.** Def.'s Facts, ¶ 42.

**114.** Def.'s Facts, ¶ 45. As noted, Pelayo does not appear to dispute that Llamas believed he had a gun or that Llamas fired at him.

**115.** Pelayo Decl., ¶ 15; Def.'s Facts, ¶ 47; Pl.'s Response, ¶ 47.

**116.** Def.'s Facts, ¶¶ 62–63; Pl.'s Response, ¶¶ 62–63.

**117.** Def.'s Facts, ¶ 50.

**118.** Def.'s Reply at 6.

their encounter in the corridor was the only contact Pelayo and Llamas had with one another, there was no other point at which Pelayo could have resisted Llamas. The resistance on which the criminal charge was based, therefore, was contemporaneous with Llamas' alleged use of excessive force, and a verdict in Pelayo's favor on his § 1983 excessive force claim would call into question the validity of his underlying conviction for violation of Penal Code § 148(a)(1).

The court reached a similar result in *Cotton v. Donner*, C 06–0862 MJJ PR, 2007 WL 1031260 (N.D.Cal. Mar. 30, 2007). There, an inmate refused an order to kneel. When an officer grabbed his arms, plaintiff punched another officer in the face. The entire altercation took less than five minutes. Plaintiff pled *nolo contendere* to one count of battery on a custodial officer. *Id.* at \*2–3. The court noted that "*Smith* drew a distinction between a plaintiff who resists officers before they use force, and a plaintiff who resists during the course of the arrest and accompanying application of force." *Id.* at \*4. It found *Smith* inapplicable because "unlike in *Smith*, plaintiff's battery on [the officer] and the officers' use of force against him did not occur in different 'phases' of the incident." *Id.* The court observed that "plaintiff punched Donner in the face after Donner and Enrico had begun to use force upon him by grabbing his hair and hands. The evidence is undisputed that the entire altercation, including the officers' use of force and plaintiff's striking Donner, was a single course of events that lasted less than five minutes." *Id.* As a result, the court held that "under the reasoning of *Smith*, *Heck* bars plaintiff's claims that

Donner's use of force against him was excessive, and on this basis, Donner is entitled to summary judgment on plaintiff's claims." *Id.*; see also *Mitchell v. Demski*, CV 06–0969 PHX MHM MHB, 2007 WL 2023471 (D.Ariz. July 11, 2007) ("Here, Plaintiff's assault on Packard and the officers' use of force against him did not occur in different 'phases' of the incident.... The evidence reflects that the entire incident involving the officers' use of force was a single course of events. As such, under the reasoning of *Smith*, *Heck* bars Plaintiff's claim that Defendants' use of force against him was excessive").

Because Pelayo has failed to raise triable issues as to whether his encounter with Llamas took place in separate phases, a verdict in his favor on his § 1983 excessive force claim for would necessarily invalidate his conviction under Penal Code § 148(a)(1), and the court grants summary judgment in favor of Llamas and his estate on this basis as well.[119]

### D. Whether Defendants' Motion for Summary Judgment on Pelayo's *Monell* Claim Against the City Should be Granted

Section 1983 liability for constitutional violations is not limited to individuals, but can extend to municipalities and other political subdivisions of a state under certain circumstances. See *Monell*, 436 U.S. at 690, 98 S.Ct. 2018. As noted, generally, a municipality cannot be held liable under § 1983 "*solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Id.* at 691, 98 S.Ct. 2018. Rather, § 1983 liability

---

**119.** Because the court has found that Pelayo's § 1983 excessive force claim against Llamas and his estate is barred by *Heck v. Humphrey*, 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994), and that Pelayo has not raised triable issues of fact regarding the City's provision of insurance to Llamas, the court declines to consider defendants' alternative arguments that Llamas' actions were reasonable, and that Llamas is entitled to qualified immunity.

may be imposed only when a municipal "policy" or "custom" is the "moving force" behind a violation of federally protected rights. *Id.* at 694, 98 S.Ct. 2018. To establish liability under this standard, plaintiff can attempt to show that a person or entity with decision-making authority within the municipality expressly enacted or authorized an unconstitutional policy or gave an unconstitutional order. See, e.g., *Pembaur v. City of Cincinnati,* 475 U.S. 469, 480, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). Alternatively, he can show that a municipal policy exists by adducing evidence of "widespread practices or ... 'repeated constitutional violations for which the errant municipal officers were not discharged or reprimanded.'" *Nadell v. Las Vegas Metro. Police Dep't,* 268 F.3d 924, 929 (9th Cir.2001) (quoting *Gillette v. Delmore,* 979 F.2d 1342, 1349 (9th Cir.1992)); see also *Bd. of County Comm'rs v. Brown,* 520 U.S. 397, 404, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) ("[A]n act performed pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law").

Inadequacy of training may also "serve as the basis for § 1983 liability," but only "where the failure to train amounts to deliberate indifference to the rights of persons with whom the [municipal employees] come into contact." *City of Canton v. Harris,* 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). To show "deliberate indifference," a plaintiff must prove that "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been

deliberately indifferent to the need." *Id.* at 390, 109 S.Ct. 1197.

■ Pelayo has adduced no evidence that a City policy or custom was the "moving force" behind Officer Llamas' allegedly unconstitutional conduct. Nor has he proffered any evidence that the City failed to train its officers adequately. Pelayo contends that defendants "had a policy of deliberate indifference [to constitutional violations], albeit a tacit understanding amongst the department and not a formal written policy."[120] He contends that the City's improper policy is evidenced by the fact that supervisors did not require Llamas to submit to an interview immediately after the shooting and that they found the shooting "was within policy."[121] The fact that Llamas was interviewed the next day, however, does not demonstrate that a City policy or custom was the "moving force" behind the incident that caused Pelayo harm—i.e., Llamas' alleged use of excessive force. Additionally, Pelayo has proffered no evidence demonstrating that the City investigated the shooting and found it to be "within policy."

Without some evidence regarding the substance of the policy that led to Llamas' alleged use of excessive force, Pelayo speculates that some City policy played a role in bringing about his injuries. Speculation of this type is not sufficient to raise triable issues of fact as to whether a municipal policy was the "moving force" behind the alleged constitutional violation. See *Davis v. City of New York,* No. 04–CV–3299 (JFB)(RLM), 2007 WL 755190, *16 n. 14 (E.D.N.Y. Feb. 15, 2007) ("Consequently, the Court finds that the *Monell* claim must be dismissed because plaintiff has failed to adduce any evidence that the alleged unconstitutional acts committed by the defendant officers were connected to any policy,

**120.** Pl.'s Opp. at 20.

**121.** *Id.*

custom or practice beyond mere speculation and conjecture"); see also *Okoro v. City of Oakland, California*, 233 Fed. Appx. 639, 641 (9th Cir. May 14, 2007) (Unpub.Disp.) ("Though discovery was available to him from at least October 2002 until April 2003, Okoro did not develop or present any evidence of a city policy or custom behind his alleged constitutional injuries. The absence of these essential elements of municipal liability under 42 U.S.C. §§ 1983 and 1981 is fatal to his case"); *Wilke v. City of Burns*, 205 Fed. Appx. 634, 635 (9th Cir. Dec. 4, 2006) (Unpub.Disp.) ("The district court properly granted summary judgment as to Wilke's remaining claims against the City of Burns and Burns Police, because Wilke presented no evidence of an official policy or custom to violate Wilke's constitutional rights"). Accordingly, the court grants defendants' motion for summary judgment on Pelayo's *Monell* claim.

## III. CONCLUSION

For the reasons stated, the court grants the motion for summary judgment filed by the City of Downey, the Downey Police Department, Officer Llamas and Llamas' estate.